The case in which panel I will hear oral argument this morning is number 07-1183 MPT v. Marathon Labels and Polymeric. I'll ask Mr. Benjamin not to start the clock quite yet because I want to just confirm with counsel how they've allotted their time here and how we're going to work the timing. Let's see, who is standing in front of me? James Costigan for Polymeric Converting LLC. Okay, so you're representing Polymeric? That's correct. Okay, now as I understand it, you have asked for 7 minutes on main argument and 3 minutes for rebuttal, is that correct? That's correct. Okay, and then Mr. Wilson, you're representing Marathon and you want 8 and 2, correct? That's correct. Okay, and Mr. Shunk for MPT, you have asked for 15 minutes to respond to appellant's arguments and you want 5 minutes for rebuttal on your cross appeal, is that correct? That's correct. Okay, I think we understand that. The final thing I'll just note before we start the clock and let the argument begin is the way the clock is going, I have in front of me, it's not set at 20 minutes, it's set at 7 so we can keep track of each person's time. I will let you know when the 7 minutes is getting to a conclusion. So, with that opening, Mr. Koskinen, go ahead and start. May it please the court, my name is Koskinen, I represent Polymeric Converting. This is an appeal from a decision in a patent case where many issues came before the jury and the jury entered a verdict infringement of the patent. On appeal, we are appealing the time construction of the court with regard to a term in the claim that's release coded. This patent contains only method claims for labeling and relabeling containers or objects. In the course of the method, there's a device used which has been called by the patentee a placard. The placard is defined as being a material having on one face a release coding and on the other face an adhesive coding. And your client provides one part of the placard, namely the Teflon. Right, that's correct. But as far as the claim construction, the claim term was construed by the court as being a covering that prevents the easy and complete removal of a pressure sensitive label. We contend that was error because the construction involved taking the term release coding and looking at it as two words separate. Going to Webster Dictionary, looking at the definition of coding and then extracting from that that it was a covering and merging that back with the term release. We provided publications and evidence to show that the term release coding is used in a labeling order. Well, Mr. Kessler, how is the district court's, in your view, how is the district court's claim construction not, how is it inconsistent with the specification? The intrinsic evidence, the most important part of the intrinsic evidence here. It's a broader term. The term covering does not appear in the specification. There's no intrinsic evidence to support calling a release coding a covering. And by taking this construction, what it does is it brings in materials to the claim that are uncoded and makes them an infringement of this claim that says release coding. We contend that's completely inconsistent. Do you say the word release layer is broader than release coding? Yes, we do. So would a release layer, according to your definition, include both a liquid coating and a Teflon coating or any kind of sort of peeled off sheet coating of any kind? A layer would encapsulate all those things? Yes. But a coating, according to you, has to be limited to liquid. That's the way the terms usually are. You know, but all the evidence that was presented, and the district court judge considered it, it does indicate that it gives examples of liquid coating. But I don't read it as saying that a release coating is exclusively a liquid product being put on top. I don't read any of the extrinsic evidence that you presented as saying that. And the patent certainly doesn't say that. It doesn't say, it doesn't disclaim more than liquid, does it? I mean, that's not your argument here, as I understand it. There's a disclaimer. The patent didn't use the word release coating as it's used in the art. It assumed everyone knew what it meant. The patentee didn't attempt to define it. So we provided evidence from the technical literature, which is very good. But the patentee used the word coating interchangeably with layer throughout the specification. The patentee had the choice of doing that. Every time they used layer, they referred to the coating on the back of the placard. They never used layer to describe the material on the front of the placard. They had a lot of demarcation. But sometimes they used the word coating and sometimes they used the word layer to mean the same thing. When they used the term release coating to refer to what they referred to as the layer on the back of the placard, they used that in reference to a manufacturer's product only. Very specific. And that product was a silicone-coated release paper. But the idea, when you read the patent, it says release coating. You should be able to rely upon that language of saying it's a coating. In this construction, we're only dealing with literal infringement. But why does coating mean liquid? A coating of something means a covering. That's, to my layman's ears, what I hear. I don't see in the extrinsic evidence anything that says it's exclusively liquid. I see examples being given by you of describing liquids as coatings, but I don't see anything that tells me a coating has to be liquid and only liquid. We had testimony from our expert at trial in opposition to the charge of willfulness where he explained that you could not put a release coating on a film or paper unless you did it with a liquid. There's no other way of doing it. During the claim construction phase of the case, we asked for a hearing and we denied a hearing. We wanted to bring in experts who would explain what this term means in the art. And the judge says, no, I'm looking at it from this point of view. And the Webster's Dictionary that she relied upon, it said coating, not a release coating, it says a coating is material used as a cover, decoration, finish, or protection. Now, if you go to the Webster's Dictionary, you try and abstract that meaning and apply it to the patent. Why didn't she call it finish? Why wasn't it called a decoration? There's nothing in the patent that takes you to the Webster's Dictionary and gets you to a cover. But the patent does, as you've acknowledged and we've both acknowledged, it does interchangeably at times use the word coating and layer. And you, by definition, would say a layer is broader, so why don't we give the patentee, since we're focusing primarily on intrinsic evidence before we look to the extrinsic evidence, why don't we say that the district court's determination that when they used coating, they clearly meant the same thing as layer because they're using them interchangeably. I think that would be regarding the claim. Because the patentee had the choice of using it for at least coating or at least layer. And if they used release coating when it came to this part of the placket consistently, only for that material, we should be allowed to rely on that. And what's wrong with breaking the two up? I mean, release clearly goes to the functionality of the product, the coating. What's wrong with the district court analyzing them as two separate words? I mean, you argue that that's erroneous as well. Because it ruins the claim. It makes the claim literally broader than what they describe in their application. No, they interchangeably describe layers and coating in their specification. We've already been through that. Well, I think it's a contention that you use interchangeably. They use both terms, but not interchangeably with regard to what goes on the front of the placket. And it comes down to this. The county says release coating. We use an uncoated material, and we infringe. Well, don't you put a piece of Teflon, is my recollection, on top? Teflon? It's not coating. It's a solid thing. Well, that's right. That's your whole argument. Right, but the whole thing is really equivalence construction, going to what the term is and what it should be to cover other things. But they were precluded, or planted, from raising a doctrine of equivalence because they waited until legal trial to bring it up, and it was excluded from the case. So this is supposed to be a literal construction of what this claim means. And we contend it's not. And when you look at the literature references, they use the two words together, release coating. And three out of four say a lacquer or a pre-lacquer. They use a liquid material. Our expert testified it's the only way of doing it. And that evidence is very probative because they did not pose it with any testimony or any document. That stands unrebutted. Well, the patent itself refers to it interchangeably as a layer, and you've acknowledged that a layer is broader. So I'm not sure your expert testimony trumps that. When you have a layer that goes broader, why didn't they use that in Claim 1? Why did they use it in Claim 5? Well, they didn't have to because they told you in the specs that a layer and a coating were the same thing. If they said that, I would agree with you. But they didn't come out and say that. So is your position that unless a specification says we define X as Y, we can never read a specification as concluding X equals Y in the patentee's mind? I think you have to see how it's used in the art. And according to the way it's used in the art, it's used to cover materials applied by other people. Do you want to talk a little bit about the injunction? Mr. Wilson is going to address the injunction. Pardon? Mr. Wilson, counsel for Marathonism and Destiny. We tried to provide this up a bit. You're now into your rebuttal time. I have just a few more remarks. Do you want to use them? I'll use part of our rebuttal time for these remarks. The description you contend is not adequate in this patent, Patrick Heller valid. They put the term substantially, permanently, attaching or affixing into the claim during prosecution. No basis in the application of doing this. The only thing is that it should be firmly and securely attached. They raised it to a different level, and they created this thing of permanent. There's no basis for it in the original application. As far as the contributory infringement, two-thirds of the sales of this product were exported to Mexico and used there. And yet the court says there is contributory infringement. The blockage manufactured in the United States, sold in the United States. Why doesn't that violate 271F2? This court held in Union Carbide very clearly that that applies to process claims and non-staple articles of good sold in the U.S. for use elsewhere. I have to say I'm baffled that the patentee didn't bring a 271F claim in his complaint. Baffled. As I understand, 271F does not apply to this. How? Because as I understand the product that we're dealing with here is an unpatented product. There's no claim to this product. 271F, Union Carbide, check our decision out. It says it clearly. In fact, there was a denial of in-bank dissent that went ballistic because they said 271F applied only to products and not to methods. And the original case itself says no, it applies to methods. This is a method claim that we're looking at in this patent. And the methods are not practiced in the United States. That's Union Carbide. You just described it. I don't believe it. This is the same fact pattern we have here. It's exported and it's applied to packages in Mexico. And the NTP says that this is not an infringement. I can't argue with you over that. They say that's not an infringement, but I don't get why. Thank you. All right, Mr. Cousins. Thank you. Let me just, before Mr. Wilson starts, I want to make sure where we are on the time here. Mr. Benjamin, am I correct in concluding that Mr. Costigan used all of his ten minutes plus 58 seconds? Ten minutes and 58 seconds. Ten minutes and 58 seconds. All right. We'll give you some rebuttal, Mr. Costigan. Thank you. But right now you're 58 seconds in debt. I don't want to sound like a loan agent here, but we have to sort of keep trying to keep people even. Okay, Mr. Wilson, you're going to talk about the injunction. That's what the Court's hoping you'll start with. In that case, I will start with the injunction. The injunction is in conflict, in our view, with the reasoning in the memorandum and opinion that seems to suggest that the manufacturer of the, what should we call it, the polymeric placard that fits into the Dranzig patent is not in and of itself offensive or an infringement of the method and process claims. However, and then the judge goes on to suggest that if we want to attempt to sell the placard, we might make it a poison pill for the purchaser by putting some cautionary language on the placard that says if you use this placard, you may well violate the claims in the method and process patents, which were, of course, the purpose for bringing this case in the first place. We just, I don't know what happened between the memorandum and opinion and the injunction language, but we feel, of course, quite scalded by the injunction language. We think it's way overbroad. We also think, as I have suggested, and I think this sort of draws a pretty sharp retort, that the court is giving sort of a judicial sanction here to an unlawful tying approach to the market. There is some evidence in the letter written here, as a matter of fact, from the plaintiff's counsel that suggests that under the current circumstances, as well as those which prevailed before the case was brought, as long as the customers buy the Kennedy placard, they will not be bothered by a suggestion that they need to take a license, a separate license to practice the patent. And the letter, it's clear at the end of the appendix here, I won't draw your attention to it, from Mr. Shunk to Mr. Gernick, a likely customer for the placard products who actually testified at the trial. I mean, you can correct me if I'm wrong, but as far as I can tell, there wasn't a lot of attention given at the trial. And please correct me if I'm wrong. There didn't seem to be a lot of attention given at the trial to antitrust issues. There were some statements made. The judge made a, I think the judge made a comment about, had a dominant position, MPT did, and you were referring to the letter. But there really didn't seem to be a lot of attention given to antitrust stuff. And is this, are we really in a position to rule on that basis? I mean, see what I'm saying? Well, no. Maybe not, but I'm in a position to complain about it. And I intend to continue to complain about it. Oh, no, you can complain. I'm not saying that, but I'm just, I mean, there doesn't seem to be much of a record for an antitrust type issue here. I think you're correct. Frankly, I believe after a long delay between entering the jury's verdicts and actually reaching a judgment in this case, and with it, this ongoing injunction, I anticipate, and I'm speaking personally, that we would in fact visit with the court again and go into precisely what the four-factor test that we made might mean if applied to the plaintiff, who, according to the judge, has the dominant position in the market, may indeed be the only supplier of this particular laminated structure in the market. We didn't have that opportunity. So in the injunction, just so I understand it, the judge said that SSPs can't be sold at all, right? The injunction prevents you from selling them at all. That's the way we read it. But he also made a determination that the SSP was a non-staple article of commerce, which implies it has no substantial non-infringing uses. So where's the harm? I mean, every time it's used, it's going to amount to infringement, so why not just bar you, even though this is a method patent, why not bar you from selling it altogether? Well, this was another argument, of course, that I hope to be able to revisit in this particular session. We felt and still feel that it is the burden of the plaintiff to show that there are no substantial non-infringing uses of the product. We pointed out in the record where they did just that. Patrick Kennedy, one of the witnesses, talked in response to my questions about the brochure, which is used to advertise the plaintiff's placard. I was perturbed because every page of the product brochure has printed at the bottom the method and process patent numbers. And I carefully examined him. You can see it in the record. It will be condensed for you. Do these particular pictured applications of the placard fit within the scope of the claims of the patent? He conceded about half of them did not. So from the plaintiff's witnesses came the testimony that there are substantial non-infringing uses which could be made. How could that placard be used that's not infringing this method patent? In my library books, frankly, that I get now, I have for all the world, it looks exactly like these reusable, if you will, labels on a placard, which is permanently affixed to the inside cover of my library book. That's an example. The IRS label is another example. Did you introduce that evidence at trial? Not the library book. No. I was guessing possibly not. But the judge still concluded that these were non-staple articles of commerce. Isn't that automatically a conclusion that there's no substantial non-infringing uses? Well, forgive me, but the judge is Judge Golan. We simply have a major disagreement. If you think that is her finding, and I agree it comes out that way, it doesn't comport with the evidence. I don't know what else to say about it except that the plaintiff's witnesses, again, Dr. Prowl, for all that we've argued with his expertise, Mr. Petru, the actual named inventor, both conceded that we're after the method of process claims here. There is no patented structure. It is a pretty ordinary device, which succeeded, if you permit me to say so, in the patent office because of an extensive affidavit as to the fact that it filled a long-felt need. It did not survive the examiner's observation that it was obvious. It survived in the first patent because it fit a long-felt need. It is, nevertheless, a stable article, much like, again, the IRS label, the Avery, Denison. But whether something is a non-stable article of commerce and has substantial non-infringing uses is a question of fact that we review for clear error, and suppose that I don't determine that it's clear error. So here's my question. I'm trying to go back to this injunction because, I mean, I was troubled when I read it initially, and I'm trying to figure out, though, if she concluded it's a non-stable article, or he, I don't know whether the judge is a man or woman. If she concluded it's a non-stable article of commerce, and if I don't reverse that finding, is there really any need to modify the injunction? Because I'm with you. If I reverse the finding on contributory infringement, clearly the injunction has to be modified. But if we don't reverse the finding on contributory infringement, it seems to me that the language she used is not probably the language I would have chosen, but I'm not sure that it's an abuse of discretion. Is that the standard? I think I realize where you are heading. It's getting rather narrow and tight for me on that subject. But I'm reminded, and I want to bring it to the Court's attention, this case was supposed to be submitted to a jury. Prior to the jury's deliberations on the liability phase, the judge said, literally said, I have allowed enough testimony now that if the jury believes the witnesses, that the defense has brought in particular, my complaint of obstruction will not be followed, and I'm not going to change it. So the actual limitations in the structure within the claims were a done deal. The jury never got to consider that question of fact. I think the instruction was so limited and so strong that all they had to do was look at the use, that was her term, of the structure. But she had already determined, met the limitations of the claim, that the jury, who ultimately make the decisions on which the judgment was rendered, probably didn't spend a whole lot of time trying to figure out what in the world substantial non-infringing uses were. But the jury did make that fact finding, right? The jury found, I mean, I'm looking on the appendix that you submitted, and certainly the jury found contributory infringement. They did. And the jury was instructed as to the law of contributory infringement that that would require that the product be a non-stable article of commerce with insubstantial non-infringing uses. They were, Your Honor, but they had precious little to work with, is my whole point. So it's a substantial evidence sort of argument. It is a substantial evidence argument. Making sure I understand your argument. All right, Mr. Willey, you've used your time. I'll check to see what, if anything, you have left. All right. Thank you very much. Thank you. Before we hear from Mr. Shunk, I just want to check with Mr. Benjamin on the clock. How much total time did Mr. Wilson use? He used actually 10 minutes and 14 seconds. Okay. So Mr. Wilson is 14 seconds over his total time. Right. Okay. All right. Mr. Shunk? Thank you, Your Honor. May it please the Court. There you are. I am. And may it please the Court, I'd like to begin with the question of substantial non-infringing uses and injunction, because they are clearly related. If, indeed, there is no substantial non-infringing use for the smart surface placard or for the sandwich top portion that Paula Merritt makes, then clearly it was appropriate for the judge to say, you shouldn't be able to sell this item in the United States because we know what is going to be done with it. It has no other substantial non-infringing use. But what about the sellers to the—when you sell it to a reseller who's not going to use it but then is going to sell it outside the United States? You didn't bring a 271F claim, did you? We did not, Your Honor. Why? And Your Honor expressed surprise at that. The reason was that we only found out about the sales outside the country literally weeks before the matter went to trial. Did you make a motion to amend? We did not. We did not, Your Honor. So you dropped—but you even acknowledged here on appeal that you acknowledged in your motion for use of the process outside the United States do not amount to infringement. I don't have an answer for Your Honor. I certainly—if Your Honor believes that this is an infringement under Section 271F, I would not disagree with you. When we looked at that section, we made the determination not to seek to add that to our claim at the time of trial. You're just saying—what you're saying, Mr. Shunk, is a matter based on when you learned this and as a matter of litigation approach and judicial efficiency, you determined not to press that claim. That's correct, Your Honor. You can see, I believe, that— You're just saying you basically made a litigation choice as to what you were going to accuse the defendants of. Yes. But then doesn't that require us to modify this injunction ultimately? Because what the Court has done in the words of this injunction is to prevent them from which you have admitted to us unequivocally does not infringe. Whether it does or doesn't, you've said it doesn't. And we should hold you to those statements. Judge Gahn's decision to do that is expressed in her opinion. And in part, she points out that it is much more likely to believe that people who buy something will use it where they buy it. In this particular case, there was a tremendous amount of difficulty in finding out the details of the actual sales of these products and finding out how they were used. Because this is a method patent situation and because the customers are the ones who ultimately infringe, it was very difficult. Now, we met that burden, but it was very difficult to trace each one of these plastic items and find out how it was going to be used. Judge Gahn believed that because there were no substantial non-infringing uses in the United States, the best way to protect the patentee's rights would be to require that if someone wanted to use it outside the United States, let them ship it then directly outside the United States. She didn't see that there was any real adjustment. Let who ship it directly outside the United States? The seller. In other words, here's the situation. But they can't sell it to anyone. Oh, so you're saying if they're selling it to someone outside the United States and not to a reseller in the U.S., then they won't be affected by the injunction? Yes, Your Honor. Let me tell you, if I may, what the specific facts that gave rise to this were. The customer of Marathon was Delphi. Delphi Automotive Products often bought these SSPs and would use them in the United States fully, as they testified, with their customers. Sometimes, however, Your Honor, they bought them at their Nacogdoches, Texas, plant and then trans-shipped them across the border into Mexico and would use them down there. And that was the only foreign sale that was actually discussed, but it was a large one. We made the point to the judge that if Delphi could easily simply arrange to purchase these things directly through its Mexican subsidiary, why should it be permitted to purchase it in Texas and then ship it across the border? The same thing could be achieved by simply shipping the product to Mexico. And Judge Gahan's order does not prohibit Marathon from making these things and shipping them to a foreign customer in Mexico or to the foreign subsidiary of Delphi in Mexico. She simply says, no, as a matter of protecting the patentee and its ability to trace how these things are going to be used, I'm going to require that the placard be sold to the person who's really going to use it. But you do agree that if, in fact, it was clear that the product went to the distributor of the Texas-Mexican border and then was trans-shipped across the border, there would not be an infringement? Your Honor, I'm troubled by what Judge Moore has said. And without looking further at Section 271F, I can't answer that. I can say, though, that in this case, we did not challenge that as an infringement. It was a matter that came up at the last minute, and we simply didn't give it consideration during the time of the trial. You're saying, leaving aside whatever the law is, you haven't charged it? We have not charged it in this case. Let me just ask you, Mr. Shull, getting back to the injunction that you were discussing, wouldn't it—and I guess the injunction, well, it appears in a number of places, but I'm looking at page 2 of the Joint Appendix. And take, for example, the first paragraph under 4, the A. It says, Using within the United States the smart surface placard or any products that are not colorably different from the smart surface placard. Wouldn't it be appropriate to add at the end of that sentence, to practice the method claimed in U.S. Patent Number 790 in the reissue patent? I mean, wouldn't it be a bit more—I don't want to sound belt-and-suspender-ish here, but wouldn't it make sense to just make it—I mean, that's what they really can't do. They can't use the smart placard in connection with practicing the invention, which is a method. So why would it not be appropriate to just revise the injunction in that respect? Well, Your Honor, there is no use for this item other than to practice the methods of the patent, as the jury found. But could there not be, maybe, at some point—I mean, does it hurt you in any way if that language is put in there? It does, Your Honor. You've asked me two questions, and let me say first, it would hurt us because the companies that buy these products are generally not looking at the details of the patents that are—I hate to say unsophisticated—perhaps unsophisticated in the patent law may be very sophisticated in their own business. No, that's fair. And if there is no other use, there is no reason to put that language in. And I would suggest that if another use for these items comes around, I would imagine that Judge Gahn would entertain a motion to amend her injunction so that words to the  patent. But as long as we have been put to the point of proving no substantial non-infringing use, and we have proved it, I think that we are entitled to this injunction. I'm sorry, but wouldn't that language just really state what the law is? That these things—I mean, what your client has is a method patent, and apparently it's a profitable patent. And what they can't do is use the placards in a way that would violate the patent. You're right, Your Honor. I mean, as a matter of law, it seems to be a correct statement of what their legal obligations are. Your Honor's statement, in my view, would be no different from what Judge Gahn has said. It would be accurate as a legal matter. My concern is that it would suggest to an unsophisticated reader that, well, there must be all kinds of uses for these things that we can put them to, and then now we're back to tracking down each individual user and arguing with them about the method patent and what it means. It seems to me that having been forced to go through this litigation to the extent we have, that burden should be shifted somewhat onto the defendants. If they believe they have alternative uses for their product and their customers want their alternative uses, then I think that it would be appropriate for them to go back at that time. Mr. Shunk, let me ask you one other thing. I mean, I gather nothing here in the injunction, and correct me if I'm wrong if you read it differently, bars polymeric from selling its Teflon strips or its Teflon product, right? Well, keep in mind, Your Honor, if you would, what exactly polymeric sells. It does not sell just a Teflon strip. The actual polymeric product is a laminate of Teflon with a special adhesive along with another piece of plastic underneath the Teflon and an adhesive associated with that. That entire laminate is then laminated by Marathon or was before the injunction onto another sandwich that had other characteristics to it. Because there's nothing, though, in what I'm trying to get. There's nothing in the language of the injunction, as far as I can tell, and correct me if I'm wrong, there's nothing in the language of the injunction that specifically bars what polymeric sells. It bars the placard, and polymeric's product is part of the placard. No, Your Honor. We never claimed that the Teflon sandwich made by polymeric was a smart service placard, and therefore that language doesn't appear in there. We're concerned about the smart service placard. So, I mean, what I'm saying is polymeric could, assuming it doesn't engage in the kind of activity that was found to be at issue here, it could continue to sell its product without possibly running afoul of the injunction. Is that correct? Perhaps, although, again, there was no alternative use found for that product either, and it was shown that the product was specially made, custom made, as a matter of fact, to be used with the SSP. So, Your Honor's asking me a hypothetical question. If there should be some use in the future, determine this injunction, I don't know what that use might be, but this injunction would not stop that alternative use if some were found in the future. If, Your Honor, and I see that I have a few minutes left. You want to get into your cross appeals? Yes, that was what I was going to address. As the court knows, the In Re Seagate case came out between the red and the yellow briefs in this case. Our red brief relied on underwater devices. Obviously, we had to shift gears by the time we got to our gray briefs. Mr. Shunk, let me ask you, on the cross appeal, and I'm glad you raised it because, I mean, it's certainly true that you did your job and you hold in your hands a verdict of infringement, but Marathon and Polymeric, I think the judge concluded, aren't the sort of bad citizens that should be hit with a willful infringement. Your Honor, I disagree, and let me explain. I mean, there seems to be a fair amount of evidence to support that conclusion. Your Honor, that is true until February of 2006 when Judge Gaughan issued her claim construction decision in this case. And in that regard, our argument on appeal is something, I think, beyond where Seagate is. Seagate teaches, I believe, that if you want to rely on post-filing activity as a basis for willfulness, Seagate suggests that you ought to bring a preliminary injunction motion and you better win it too. We did not do that. We believe that the events that should give rise to a finding of willfulness were the decision of the defendants to carry on in this case when Judge Gaughan told them what she believed release coding meant. Because at that point, they really had no other defenses in this case. Their argument from that day forward, and we try to track this in our brief in specificity, was simply to say, well, it's going to be difficult for you to bring in witnesses. You may not find one. You may find it hard to track where we've sold all of our materials. And so we're going to sit back and wait for you to prove your case. Well, that's fine. That was our duty, and we did it. We went out and brought in the customers, and we had the testimony. But it seems to me that In re Seagate is saying, no, if you choose to take that path where you're simply going to rely on the requirement that the plaintiff prove its case and you have no good faith defenses yourself left, then you open yourself up to willfulness. Now, why didn't we bring a motion for preliminary injunction right after the judge ruled? The answer was that only a week or two later we got the trial order, and we knew from February we were going to trial in September of that year. It simply didn't make economic sense to then proceed on for the preliminary injunction motion. But I would ask the court to consider the post-Markman activity of the defendants as a basis for sending this to Judge Gahan and asking her to agree with the jury's finding that there was indeed a willful activity by the defendants. Counsel, if I'm understanding your argument right, I just want to make sure I'm getting it. You're not saying that she's wrong to determine that there's no willful infringement prior to the claim construction ruling. You're saying that as of the claim construction ruling it became clear then that they infringed and as a result from that exact moment in time forward their continued sales amount to willful infringement. Yes. That's going to put us, I don't know, won't that put us in a bit of an awkward position? Aren't we now suddenly going to be in the business of looking at litigation and when every litigation seems to be going in favor of the patentee from that point forward willfulness is going to kick in whereas when every litigation may seem, do you understand the issue? Yes. I mean litigation goes like this, right? They win some, you win some. A lot of times it goes like this. And so are we now going to jump right in the middle and try and figure out at what point in time they should have known? Your Honor, I have that question with Inouye Seagate because when I read Inouye Seagate on August 20th it seemed to teach us that we should look at the stat, at whether there was an objectively based defense at the time of the trial. At least those seem to be the words. Well, they still had all these defenses, right, that weren't tried at the time of the claim construction ruling, namely their validity defenses and their non-infringement contentions and all those other things. The non-infringement contentions that they had, I think that the fact that the judge was moved sui sponte to grant judgment as a matter of law on the question of whether the SSP is a placard is evidence of the frivolous nature of the defenses that subsequent to the Markman decision were raised in this case by the defendants. You realize, don't you, that even if we were to suggest that maybe as of the moment of the claim construction ruling they should have known they were on the hook for willfulness, even if we were to suggest that, we send it back to her and she has complete and utter discretion to decide whether to multiply damages or award attorney's fees. You really think she's going to give them to you? I mean, come on. She said she doesn't think they're bad guys. She thinks they tried to design a round. She obviously let these other issues go to trial. They weren't resolved on summary judgment. So what are you really looking for? I have an answer for that, Your Honor. I think Judge Gahan was impressed by the sincerity of the defendants in their belief, as incorrect as it was. And she believed that under underwater devices, that gave her the reason to do what she did. If this court tells her, Judge Gahan, the sincerity of the defendants is not the issue, it is the objective baselessness of their position, I believe she will do what the law tells her to do. I think Judge Moran had a question. Yes, Your Honor. Well, as a district court judge, I'm well aware of the fact that claim constructions coming up to the Federal Circuit generally get overturned about half the time. When you're saying that there's no defense because a district court judge has come up with a specific claim construction, and it's going to go up in appeal, the people honestly and sincerely believe that the district court judge was dead wrong. Your Honor, I was in that exact position as a defendant in a case before this court that was decided called Kleenox. And in that case, Judge Lettner in New Jersey ruled against me on claim construction on the day of trial, because that's when he held his hearing. At that time, I stood up and invited summary judgment to be awarded against me so that I could proceed to this court and challenge Judge Lettner's claim construction, but I admitted to him that on the basis of the claim construction, I had nothing to go forward and did not want to waste the court's time. I came here, this court reversed Judge Lettner, and we went back for further proceedings. I think that's what the litigant should do. If you get a claim construction that is dead against you, as it was here, I would suggest, then I think that you should tender to the court the fact that you have no primary fixture basis for going forward, and if you feel appropriate, come to this court. And Your Honor, I see I have two minutes left, so unless the court has any other questions... All right, we'll tell you what we'll do. Mr. Shump, you have two minutes left, I guess, to respond to any comments. So we'll hear from you if you have to respond to anything they say about your cross-appeal. Yes, Your Honor. But if they don't mention the cross-appeal, we won't be seeing you again. I understand, Your Honor. All right, let's see. Mr. Costigan, Mr. Wilson, you both went over time, but we will restore your full rebuttal because you had a number of questions. So, Mr. Costigan, you can go first. You have your three minutes, and we'll give Mr. Wilson his two minutes. Thank you, Your Honor. In our brief, we have a chart at page 23 where we show the structure of the smart-surface placard and contrast it to a diagram of Claim 1 of the 790 pattern. In that chart, it shows each element of what we have in our product, and it tries to identify the elements from the claims and apply them to that chart. In the chart, to correspond to the term placard, we've identified a composite structure. Page 23 of our main brief. The other one. I have to remember, yours is the one without the rings. Yes. This is what you're... That's correct. Now, in the court, in taking the matter from the jury, the rule of the law, and the court says, since I construe the term release coding as being a covering, I'm going to say that the claim is infringed by your structure because the Teflon film is on the face of the placard. The claim language says that the placard has a release-coded face and an adhesive-coded face. When you try to identify our placard structure here, we contend that it's adhesive-coded on both faces. The Teflon film is not on the face of the placard. And the reason we think that's a very probative argument is that the inventor of trial testified the adhesive is not part of the structure of the placard. The placard was defined by the court during claim construction as being a support structure. If the inventor says the adhesive is not part of the support structure, then the Teflon film cannot be on the face of the placard. On the question of the sales of the product to Mexico, what actually happens is that they were produced in the United States, sold to Delphi, and delivered to Texas. Manufactured complete in the United States, made sale complete in the United States. Then they were transshipped to Mexico where they were used. And under the authorities that we've cited in our case, we believe that a method claim can't be infringed unless the method is practiced in the United States. The total sales of that, and this testimony we cited in our brief, two-thirds of the sales. Can I ask you one question? Would you be willing to speak to inducement, or should I save that for... We were not held to be inducing infringement. Oh, so then that's not you. Okay. So, on the issue of contributory infringement, there were two phases to our argument. One was that two-thirds of the product were delivered to the United States and then exported. The present injunction says that we cannot use or promote the product in any of the exact languages for... Well, your product is not the placard, though. That's correct. But the injunction says, selling or offering to sell to the United States a smart-surface placard, we contend that's error, because it didn't patent the product as far as the NPT. On the question of obviousness, we believe the French patent clearly shows the same structure that is pulled out as a placard in the patents in suit here. What it does is it's called a label medium, but it can be film or paper, coated on one side with silicone release material, and coated on the other side... Now, you're past your time. Thank you. Actually, I think also that didn't come up. I don't recall obviousness coming up from Mr. Shunk anyway. But in any event, that aside, you're over your time. But we'll hear from... Thank you. I hope I'm not still just the injunction guy. Well, you may get one or two questions on that. But I'm happy to deal with any questions, of course, that come. If Mr. Costigan's arguments are persuasive, my job becomes history and not terribly important to the outcome of this appeal. Marathon firmly believes, maybe more firmly before I heard the interchange with the court, that Mr. Costigan is right. We're also convinced that Judge Gaughan had a real epiphany after admitting the testimony that Mr. Costigan produced and was between a rock and a hard place as to what to do, recognizing that she was going to deliver the ultimate questions of fact to the jury on an instruction that they might well believe, and she says so. She didn't ding the credibility of those witnesses. She didn't diminish what they said. They were important enough in her calculus. And she became worried that if she gave the jury the job that she fully intended to give them, without changing her instruction, they would not be able to follow her instruction. Clearly to us, then, that means that the jury got a false premise, their verdict cannot stand, and we ought to have a new trial where many of these issues, I think, would get revisited and restructured. The time's about to run out. Can I ask you one question? Of course. If we were to affirm on willful infringement, does that mean we would need to reverse the judgment against your client on inducement? And I say that because under DSU medical, our test for inducement almost kind of tracks willful infringement with regard to... So I'm curious. She made a willful infringement finding under the old intent standard, which seems to be very similar to what we're now requiring for inducement. Well, of course, I'd like to get out from under anything that I'm given relief from here. I'm not sure that I would argue... Why would I argue with what you just said about the trend the court has taken? I want to suggest another reason why inducement is just such a fiction in this case. The one customer, the only customer that bought our placards, that was heard from in the courtroom, was practicing the method for decades before we ever came along with the improved product. The customer came to us to buy something that worked better, that wasn't so substantially permanently attached to these totes that run all over the world and became a pain in the process to take off. They came looking for us. We did not induce Delphi in the traditional sense to buy our product and replace the Kennedy product. What happened with everyone else that the jury put in their verdict, the one interrogatory I got to ask, I don't know because there simply was no clear evidence as to what those other people were doing with the Smart Shoes product. Thank you. Mr. Wilson, thank you. Your time has expired. Thank you, Mr. Costian. Mr. Wilson, thank you, Mr. Schunk. The case is submitted. That concludes this morning's proceedings. As far as Panel I is concerned, the members of the panel will now step down and a new panel will be reconvened.